**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF TOP ZINC LIMITED AND ZINC HOTELS (INVESTMENT) LIMITED FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. §1782 | No.: 1:18-MC-00169 |

**TOP ZINC LIMITED'S AND ZINC HOTELS (INVESTMENT) LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. §1782**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL HISTORY...........................................................................................3

FACTUAL BACKGROUND........................................................................................4

      A.    Zinc and Hilton .........................................................................4

      B.    Zinc Leased Its Hotels to Hilton ...............................................5

      C.    Zinc's Financing Arrangements.................................................6

      D.    Hilton Avoids Obligations Under the Hotel Leases ..................7

      E.    Hilton Forces Zinc into Administration as Zinc's Financing Arrangement Is Set to Expire....................................................8

      F.    Hilton's History with Other Counterparties.............................10

            1.    JFK Hotel Owner, LLC v. Hilton Hotels Corp.............10

            2.    Bisaria v. Hilton Existing Franchise Holding, LLC ......11

ARGUMENT ............................................................................................................12

   I.    ZINC'S APPLICATION MEETS ALL THE STATUTORY REQUIREMENTS FOR DISCOVERY PURSUANT TO 28 U.S.C. §1782.......................................13

      A.    Respondent Can Be Found in This District ..............................13

      B.    The Discovery Sought Is for Use in a Foreign Proceeding Before a Foreign Tribunal ..............................................................15

      C.    Zinc Is an Interested Person.....................................................16

   II.    THE DISCRETIONARY FACTORS SET FORTH IN *INTEL* WEIGH IN FAVOR OF GRANTING ZINC'S APPLICATION.............................................17

      A.    The First *Intel* Factor Weighs in Favor of Granting Discovery................17

      B.    The Second *Intel* Factor Weighs in Favor of Granting Discovery ...........19

      C.    The Third *Intel* Factor Weighs in Favor of Granting Discovery ...............20

      D.    The Fourth *Intel* Factor Weighs in Favor of Granting Discovery….. .......20

CONCLUSION.........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*App. of Sarrio S.A. for Assistance Before Foreign Tribunals*,
    173 F.R.D. 190 (S.D. Tex. 1995) ............................................................21

*Barrat v Shaw & Ashton*
    [2001] CP Rep 57 ..................................................................................18

*Bisaria v. HTL (Hilton) Existing Franchise Holding, LLC*,
    No. 10-cv-61949, ECF No. 1 (S.D. Fla. Oct. 14, 2010) .........................11

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ....................................................................12

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ..............................................................................14

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) ..................................................................19

*Gorsoan Ltd. v. Bullock*,
    652 Fed. Appx. 7 (2d Cir. 2016) ...........................................................17

*In re Application of Carsten Rehder Schiffsmakler Und Reederei Gmbh & Co.*,
    No. 6:08-mc-108, 2008 WL 4642378 (M.D. Fla. Oct. 17, 2008)...........17

*In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor
    Court of Brazil*,
    466 F. Supp. 2d 1020 (N.D. Ill. 2006) ...................................................15

*In re Application of Guy*,
    No. M 19-96, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004) ................19

*In re Application Pursuant to 28 U.S.C.
    §1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy,
    L&M Galleries and Other Non-Participants for Use in Actions Pending in the Norway*,
    249 F.R.D. 96 (S.D.N.Y. 2008) .............................................................16

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998)...................................................................20

*In re Clerici*,
    481 F.3d 1324 (11th Cir. 2007) .............................................................17

*In re Edelman*,
　　295 F.3d 171 (2d Cir. 2002)............................................................................13, 21

*In re Ex Parte Application of Kleimar N.V.*,
　　220 F. Supp. 3d 517 (S.D.N.Y. 2016).....................................................................14

*In re Ex Parte Application of Porsche Automobil Holding SE for an Order*
　　*Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in*
　　*Foreign Proceedings*,
　　No. 15-mc-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ....................21

*In re Republic of Ecuador*
　　No. 1:10-mc-00040 GSA, 2010 WL 4027740 (E.D. Cal. Oct. 14, 2010) ................6

*In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP*
　　*Pursuant to 28 U.S.C. sec. 1782*,
　　110 F. Supp. 3d 512 (S.D.N.Y. 2015).....................................................................13

*In re Request for Judicial Assistance from the Dist. Court in Svitavy, Czech Republic*,
　　748 F. Supp. 2d 522 (E.D. Va. 2010) ...............................................................12, 17

*In re Veiga*,
　　746 F. Supp. 2d 8 (D.D.C. 2010) ...........................................................................15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
　　542 U.S. 241 (2004).......................................................................................*passim*

*JFK Hotel Owner, LLC v. Hilton Hotels Corp.*,
　　No. 650502/2013, NYSCEF No. 2 (Sup. Ct., N.Y. Cnty. Mar. 14, 2014) .......10, 12

*Marubeni Am. Corp. v. LBA Y.K.*,
　　335 Fed. Appx. 95 (2d Cir. 2009) ..........................................................................13

*Nokia Corp v InterDigital Technology Corp*
　　[2004] EWHC 2920 .................................................................................................19

*South Carolina Insurance Co. v Assurantie Maatschappis "De Zeven Provincien" N.V.*,
　　[1987] 1 AC 24 .......................................................................................................19

*Matter of Simetra Global Assets Ltd. and Richcroft Invs. Ltd.*,
　　No. 16-cv-2389, 2016 WL 3018692 (D.N.J. May 25, 2016)...................................21

*Teva Pharma BV v Amgen, Inc*
　　[2013] EWHC 3711 .................................................................................................19

*US Bank N.A. v. Hilton Worldwide, Inc.*,
　　No. 2:11-cv-02823 (E.D. La. Nov. 14, 2011) .........................................................12

**Statutes, Rules, and Regulations**

28 U.S.C. §1782.................................................................................................... *passim*

Civil Procedure Rules
    Rule 7.2(1)......................................................................................................3
    Rule 7.4..........................................................................................................4
    Rule 7.5(1)......................................................................................................3
    Rule 31.17......................................................................................................19

 Federal Rule of Civil Procedure
    Rule 26(b)(1)................................................................................................15
    Rule 30(b)(6)................................................................................................18

Top Zinc Limited ("Top Zinc")[1] respectfully submits this Memorandum of Law in support of its Application (the "Application") under 28 U.S.C. §1782 ("§1782") for an order authorizing it to obtain limited discovery from Respondent Hilton Worldwide Holdings Inc. (formerly Hilton Hotels Corporation) ("Hilton US" or "Respondent") in the form of the attached subpoena (the "Subpoena").

## PRELIMINARY STATEMENT

On February 5, 2018, Top Zinc – the ultimate parent company of the owner of ten hotels in the United Kingdom (the "Hotels") – filed a lawsuit in the High Court of Justice, Business and Property Court of England and Wales against a number of defendants, including several Hilton entities and executives (the "Lawsuit").[2]  The Lawsuit seeks damages arising from Hilton's tortious and other unlawful conduct in connection with the lease of Zinc's Hotels.

Some 15 years before, in 2002, Zinc leased the Hotels to two Hilton entities, Adda Hotels and Puckrup Hall Hotel Limited,[3] under ten identical occupational lease agreements (the "Hotel Leases").  The Hotel Leases had several important terms, including:

---

[1]     Top Zinc is the ultimate parent company of all Zinc entities.  Top Zinc and its immediate subsidiary Zinc Hotels (Investment) Limited are the only two claimants in the foreign proceedings.  The other Zinc entities were placed into administration on January 9, 2018, which is an insolvency procedure under English law designed to assist companies to repay their debts. A complete breakdown of the Zinc corporate structure is attached to the Declaration of Mark Derick Payne ("Payne Decl.") as Exhibit A.  Top Zinc was formerly known as Flying Tindall Holdings Limited which was the parent of Tindall Hotels (General Partner) Limited (Tindall GP) and Tindall Hotels Limited Partnership ("Tindall").  In a 2014 restructuring the Hotels were transferred from the Tindall group companies to the Zinc group companies, but this did not affect any rights or obligations under the Hotel Leases.  For the sake of simplicity, we refer to "Zinc" to include all companies in the corporate structure and all predecessors-in-interest.

[2]     Unless otherwise indicated, Hilton is defined to include all companies in the Hilton group of companies.

[3]     Adda Hotels and Puckrup Hall Hotel Limited, respectively "Adda" and "Puckrup" are herein collectively referred to as the "Hilton UK Tenants."

- The Hilton UK Tenants would operate the Hotels in accordance with Hilton's own brand standards which required that each Hotel be maintained to the level of a "first class hotel" and conform to certain maintenance standards.

- Hilton Group PLC was the guarantor for the Hilton UK Tenants' obligations. This guarantee was subsequently passed to Hilton Worldwide Inc. (now Park Hotels & Resorts Inc. ("Park Hotels")).

- If Zinc ever wished to sell the Hotels, Hilton had a right of first offer (the "Right of First Offer").

Hilton's obligations under the Hotel Leases were critical to Zinc, as they provided important collateral for financing and ensured the ongoing value of the Hotels.

When Hilton's operation of the Hotels portfolio under the Hotel Leases started underperforming, Hilton engaged in an extensive pattern of misconduct. In July of 2014, the Hilton UK Tenants sought to assign the Hotel Leases, but a court in England declared the attempt unlawful. In addition, evidently seeking to diminish the Hotels' value so that it could extricate itself from the Hotel Leases (whether by purchasing the Hotels pursuant to its Right of First Offer at a bargain, or otherwise), Hilton refused to spend money on basic upkeep, leaving the Hotels in a state of disrepair. And finally, when Zinc attempted to sell the Hotels, Hilton sabotaged the sales process and forced certain Zinc entities into administration.

Zinc requests permission to obtain evidence located in this District and, as described below, meets all of the requirements for obtaining the requested discovery under §1782. **First**, Hilton US "resides or is found" in this district because it conducts "systematic and continuous" business in the District. **Second**, the discovery Zinc seeks regarding Hilton US's possession of Zinc's confidential business information (Hilton's corporate strategy of distressing their business partners to escape contractual liabilities) is crucial to the resolution of issues in the foreign proceeding. **Finally**, Zinc is an interested person given that it is a plaintiff in a foreign proceeding.

Zinc not only meets the statutory requirements for obtaining discovery, but it also satisfies the discretionary factors the Supreme Court set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).  ***First***, while Hilton is a party to the foreign proceeding, the discovery Zinc seeks cannot be obtained in that proceeding.  ***Second***, English courts have long been receptive to discovery under §1782.  ***Third***, Zinc does not seek to circumvent any policy of the United States or England.  ***Fourth***, the request for testimony and documents is not intrusive or unduly burdensome.  This Court should therefore grant Zinc's Application and permit it to serve the Subpoena on Hilton US.

## PROCEDURAL HISTORY

Zinc's lawsuit in England is at an early stage.  On February 2, 2018, solicitors acting for Zinc sent a letter before claim to a number of anticipated defendants, including several Hilton entities and executives.  The letter put these defendants on notice of Zinc's claims against them. Declaration of Belinda Hollway ("Hollway Decl."), Ex. A.

Three days later, on February 5, 2018, Top Zinc filed a lawsuit in the High Court of Justice, Business and Property Court of England and Wales (the "Court"), in the Business List, against a number of defendants, including several Hilton entities and executives.  The Court is the court that deals with specialist business disputes in England, whether domestic or international, where the claim value is greater than £100,000, as well as business disputes including claims in tort such as conspiracy or fraud.  Legal proceedings are formally commenced when the Court issues the Claim Form at the request of the Claimant (i.e., on filing of the Claim Form) (pursuant to Rule 7.2(1) of the *Civil Procedure Rules* ("CPR")).

On April 25, 2018, Zinc filed an Amended Claim Form that replaced the Claim Form it had filed on February 5, 2018.  The Amended Claim Form added Zinc Hotels (Investment)

Limited as a claimant and added and removed various parties as defendants. *See* Hollway Decl. Ex. B.  The deadline to serve the Amended Claim Form on the defendants is June 4, 2018 (pursuant to CPR Rule 7.5(1)).  At that point, Zinc will also be required to file and serve Particulars of Claim, which set out the claim in greater detail than is contained in the Amended Claim Form.  The deadline to serve the Particulars of Claim is within 14 days of service of the Amended Claim Form (if the Amended Claim Form is served more than 14 days before June 4, 2018), or, at the latest, June 4, 2018 (pursuant to CPR Rule 7.4).

## FACTUAL BACKGROUND

### A.      Zinc and Hilton

Zinc is the ultimate parent company of the owner[4] of ten hotels (the "Hotels") that are located in, among other places, London's prestigious Kensington district and the historic town of York.[5]  Like many companies involved in commercial real estate, Zinc relies on financing, and its financing depends, in turn, on the contractual obligations of Zinc's tenants, including estimated future rental income, as well as the projected reversionary value of the property itself.

Hilton US has been a leading global hospitality company since 1919.  Based in Virginia, Hilton includes some 856,000 rooms in 105 countries and territories.  In some cases, Hilton entities own their hotels, but in other instances, they lease buildings and operate them as Hilton-

---

[4]      In England, two ways of holding property exist: (i) "freeholds"; and (ii) "leaseholds." With "freeholds," a person owns the property and the land on which it stands in perpetuity.  By contrast, a person with a "leasehold" has a lease from the freeholder (also referred to as the "landlord") to use the land for a number of years.  The leaseholder and freeholder enter into a contract called a lease, which sets forth the legal rights and responsibilities of both sides.  Leases are usually long – from ninety-nine to nine hundred and ninety-nine years – but they can also be much shorter in duration.

[5]      The hotels are: (1) Cobham Hilton; (2) Croydon Hilton; (3) East Midlands Hilton; (4) Leeds City Hilton; (5) Northampton Hilton; (6) Nottingham Hilton; (7) Tewkesbury Hilton; (8) Watford Hilton; (9) York Hilton; and (10) Kensington Hilton.

branded hotels.   In 2007, The Blackstone Group, L.P. ("Blackstone") paid $26.7 billion to acquire Hilton and, in December 2013, Hilton raised roughly $2.34 billion in its initial public offering – the largest IPO by a hotel group in history.   Hilton underwent a significant restructuring in January 2017, splitting its business into three constituent parts: (i) Hilton US retained Hilton's management and franchise business, including ownership of the Hotel Leases through ownership of the Hilton UK Tenants; (ii) Park Hotels retained a significant proportion of Hilton's hotel and resort assets; and (iii) Hilton Grand Vacations Inc. retained Hilton's timeshare business.   *See* Declaration of Mark Derick Payne ("Payne Decl.") ¶15.

**B.      Zinc Leased Its Hotels to Hilton**

In  August  2002,  Zinc  entered  into  the  Hotel  Leases  with  two  Hilton  companies  in England  that  granted  them  the  right  to  occupy  its  ten  Hotels  through  2029  under  the  "Hilton Hotels"  brand.   Each  Hotel  Lease  identifies  the  tenant  as  "a  first  class  hotel  operator,"  and specifies that it will operate a "first class hotel."  Payne Decl. ¶13, Ex. B.

The Hotel Leases imposed certain obligations on Hilton that were critical to Zinc's ability to obtain financing and maintain the value of the Hotels:

- **Aesthetic of Hotels:** Hilton agreed at "[a]ll times to keep the Hotel attractively laid out to a proper and reasonable standard consistent with the Permitted Use."  Payne Decl., Ex. B;

- **Maintenance of Standards:** In addition to agreeing to operate a "first class hotel," Hilton explicitly agreed to "clean, decorate or otherwise treat the  Hotel  (where  appropriate  in  accordance  with  manufacturers' recommendations) in accordance with the Operating Standards and to a standard befitting the Permitted Use."  *Id*.;

- **Repairs:** Hilton agreed to "pay to the Landlord within 10 Working Days of demand all costs charges and expenses" incurred in connection with keeping the Hotels up to proper standards.  *Id*.; and

- **Hilton Group's Guarantee:** Perhaps most significant of all, Hilton Group PLC agreed to guarantee "to the Landlord as a primary obligation that the

5

Tenant will pay the Rents reserved by and perform and observe the Tenant's covenants in the manner and at the times specified in this Lease."[6] *Id.*

Importantly, the Hotel Leases also granted rights of first offer to the Hilton UK Tenants. The Right of First Offer allowed Zinc to sell the Hotels, but it had to offer them to the Hilton UK Tenants first. If the Hilton UK Tenants declined to exercise their rights, Zinc could sell to a third party at a price not less than 95% of the price offered to the Hilton UK Tenants. *Id.*

C.    **Zinc's Financing Arrangements**

Starting on the day that the Hotel Leases were executed, Zinc entered into financing arrangements that depended on the terms in the Hotel Leases. The original credit facility agreement was entered into on August 30, 2002. Then, in July 2007, Zinc entered into a seven-year replacement credit facility.

As the expiration date of the 2007 facility agreement approached, Zinc began negotiating in 2013 for a third loan agreement, but these negotiations stopped when Zinc learned that Hilton was taking steps to undermine Zinc's position. Specifically – and with no advance warning – on July 1, 2014, the Hilton UK Tenants purported to assign the Hotel Leases to a series of subsidiary companies in the Hilton Group. *Id.* ¶¶23, 25. These subsidiaries, known as "GBP £1 subsidiaries," were formed for the sole purpose of receiving the assignments.

Had they been permitted, these assignments would have unilaterally extinguished Hilton Worldwide Inc.'s (now Park Hotels) guarantee obligations under the Hotel Leases. But Zinc immediately sought declaratory relief and, after an expedited hearing, the English High Court

---

[6]    Hilton Group PLC was replaced as guarantor in 2006 by Hilton Worldwide Inc. (now Park Hotels).

declared that the assignments were unlawful.[7]  The Hotel Leases were reassigned back to the Hilton UK Tenants and Hilton Worldwide Inc. (now Park Hotels) remained liable for the Hotel Leases under the guarantee obligations.

With the reassignment and renewed guarantee, Zinc obtained financing through a replacement facility agreement (the "2014 Facility Agreement").

### D.     Hilton Avoids Obligations Under the Hotel Leases

In addition to its failed assignment attempt, which meant that it remained the guarantor, Hilton had another scheme to diminish the value of Zinc's Hotels.  Despite having an obligation to operate the Hotels as "first class hotels," Hilton refused to spend money on the basic upkeep of the Hotels, allowing them to fall into a state of disrepair.

Hilton's actions not only affected the aesthetics of various Hotels, but also implicated the health and safety of guests.  For example:

- Cracking became evident to the structure in various locations beneath upper level windows, including through structural beam nibs, representing an inherent defect;

- Loose wiring, exposed terminals, and connections appeared;

- The bedrooms lacked permanent fresh air;

- The absence of safe access to a number of flat roofs and plant areas represented an inherent defect and a health and safety concern;

- Given the age of the property and Hilton's failure to make repairs, asbestos-containing materials became a risk; and

- Fire detectors went missing in certain locations and Hilton failed to comply with regulations regarding the location of smoke detectors.

---

[7]     *See* the High Court judgment *Tindall Cobham 1 Limited and others v Adda Hotels (an unlimited company) and others* [2014] EWHC 2637 (Ch).  The findings of the English High Court were upheld by the English Court of Appeal ([2014] EWCA Civ. 1215).

Hilton's deliberate neglect of the Hotels did not go unnoticed by Hilton or Zinc.  *See* Payne Decl., Ex. H.  Even worse, the conditions were not lost on Hotel guests, who complained about the deterioration of the Hotels.  As one guest wrote:

- "Absolute disaster.  The room was filthy, I could write my name in the Tea and coffee tray as well as the mirror, my little boy had black joggers on and sat on the bathroom floor, needless to say when he got up his bottom was white with dust. . . .  This hotel is run down not very clean and in major need of a full refurb.  Real disappointed Hilton." *Id.* Ex. I.

Another guest explained:

- "I'm a Hilton Honors gold member so I have standards I expect to see when staying at Hilton hotels . . .  The bedroom was outdated and felt dirty, the corridors and walkways are like being stuck in the 1970s and again seem dirty . . .  Window seals are gone so it was cold and the traffic noise was horrendous.  Emergency stairwells not clearly marked." *Id.*

Hilton's scheme to diminish the value of the Hotels forced Zinc to initiate a lawsuit in England against Hilton UK Tenants and Park Hotels on May 12, 2016 (the "Hotels Condition Action").[8]  In this pending action, Zinc alleges that Hilton's deliberate neglect of the Hotels has diminished the value of its reversionary interests in the Hotels, and thus caused it significant damage.  The Hotels Condition Action also alleges that Hilton's scheme of neglect is part of a wider strategy to avoid further investments in loss-making or underperforming hotels, and to keep them devalued – all the while trying to purchase these hotels and/or dodge its contractual obligations.  *See* Payne Decl. ¶ 29.

### E.   Hilton Forces Zinc into Administration as Zinc's Financing Arrangement Is Set to Expire

Last year, as the 2014 Facility Agreement was set to expire on July 10, 2017, Zinc sought to refinance its loan and swap liabilities with two possible financial options.  First, it sought to

---

[8]   The Hotels Condition Action does not involve Top Zinc Limited and Zinc Hotels (Investment Limited), but rather involves the Zinc companies in administration.

revise its loan facility to allow it to repay its Lenders.  Second, it decided to explore the sale of the Hotels so that it could use the proceeds to pay its outstanding loans.  While they explored financing options, the Lenders and Zinc agreed to an effective standstill of the parties' obligations under various loan agreements.

On June 14, 2017, Zinc engaged commercial real estate agents Savills (UK) Limited ("Savills") and Jones Lang LaSalle Limited ("JLL") (together, the "Agents") to market the Hotels for sale.  The Agents separately assessed the value of the Hotels in the range of £550 million to £600 million.  Importantly, a collective sale price in that range would settle Zinc's debt and swap liabilities and allow it to realize a significant profit from the sale.  Payne Decl. ¶ 34.

Pursuant to the Right of First Offer, Zinc informed Hilton on July 13, 2017 that it intended to sell the Hotels and offered them at a price of £600 million.  Hilton decided not to exercise its right.  As a result, Zinc was barred under the Hotel Leases from selling the Hotels to third parties at less than 95% of £600 million (i.e., £570 million) for a period of six months.  *Id.* ¶ 33.

Zinc began a formal sales effort which generated significant interest from prospective buyers.  Fourteen prospective bidders were given permission to speak to Hilton and there will have been site visits to the Hotels by prospective bidders.  *See id.* ¶ 36.  This gave Hilton the opportunity to "down sell" the Hotels' value, discouraging high-value bidders that did not serve Hilton's interests.

The sales process resulted in two leading offers from Cola Holdings Limited ("Cola") and DVS Property Limited ("DVS").  Cola's bid was to acquire the freehold interest in London Kensington Hilton for a price of £261.5 million, subject to the lease to the Hilton UK Tenant.

9

DVS's bid was to acquire 100% of Zinc's shares exclusive of the London Kensington Hotel for £250 million.  This outcome caused Zinc concern because the aggregate value of the bids was far below the value of the properties according to the Agents.  It was also suspiciously close to the total sums Zinc owed under the 2014 Facility Agreement and the associated swaps.  *Id.* ¶37. Accepting the bids would have had the effect of wiping out Zinc's equity in its Hotels.

Hilton's involvement in the sales process had its intended effect.  On January 9, 2018, before any bid was accepted, the Lenders, having previously agreed to an effective standstill so that Zinc could sell the Hotels, demanded repayment of the outstanding loan under the credit facility together with interest and fees, totalling £274,593,145.75.  On the same day, Alastair Beveridge, Ryan Grant, and Catherine Williamson of AlixPartners UK LLP were appointed administrators (the "Administrators") of Zinc.  *See id.* ¶¶ 9, 32.  In short, it became clear that Zinc would not achieve, through this sale process, the value that the Agents had placed on the properties.

### F.    Hilton's History with Other Counterparties

As Zinc has learned, this is not the first time that Hilton has engaged in unlawful business practices to avoid its contractual liabilities.

#### 1.    *JFK Hotel Owner, LLC v. Hilton Hotels Corp.*

In a case that echoes this one, the plaintiff in *JFK Hotel Owner, LLC v. Hilton Hotels Corp.*, No. 650502/2013, NYSCEF No. 2 (Sup. Ct., N.Y. Cnty., Mar. 14, 2014), alleged that Hilton engaged in a campaign to avoid its contractual obligations, going so far as to cause a loan default.  There, the plaintiff entered into a franchise agreement with Hilton to operate a hotel near New York's John F. Kennedy Airport under the "Hilton" brand.  Hilton agreed that it would support the hotel in a variety of ways, including in the advertising of plaintiff's rooms.  As

Hilton's financial condition deteriorated, however, Hilton did not meet its contractual obligations, using its marketing tools to favor three other hotels that it had opened in the same area.  Declaration of David R. Scott ("Scott Decl."), Ex. B ¶¶18-24.

But, even worse, Hilton took steps to cause plaintiff to default on its loan in an effort to avoid the contract altogether.  After entering into the franchise agreement with Hilton, the plaintiff entered into a mortgage with CIBX Commercial Mortgage ("CIBX").  *Id.* ¶25.  As it turns out, CIBX was affiliated with the owners of Hilton, Blackstone, though neither CIBX nor Hilton disclosed their relationship to the plaintiff.  CIBX had insisted that plaintiff's rights under the franchise agreement with Hilton would form part of the collateral for the loan – and that a termination of the franchise agreement would constitute a default.  After Hilton began to disfavor plaintiff's hotel, it later offered a pretextual reason for terminating the franchise agreement, which would have caused plaintiff to default on its loan.  *Id.* ¶¶27, 29-33.  Plaintiff obtained a temporary restraining order to prevent the termination of its franchising agreement, and later settled its dispute with Hilton.

### 2. *Bisaria v. Hilton Existing Franchise Holding, LLC*

In *Bisaria v. HTL (Hilton) Existing Franchise Holding, LLC*, No. 10-cv-61949, ECF No. 1 (S.D. Fla. Oct. 14, 2010), Hilton engaged in similar conduct.  The plaintiff, Atul Bisaria, through his entity Shubh Hotels, Pittsburgh, LLC ("Shubh Pittsburgh"), had entered into a franchise agreement with Hilton for the Pittsburgh Hilton hotel.  *See* Scott Decl., Ex. C ¶¶ 9-14. Subsequently, the plaintiff refinanced, and its debt ended up being acquired by Blackrock Financial Management, Inc. ("Blackrock Financial").  *Id.* ¶¶ 16-17.  As Hilton and Blackrock Financial conceded, they conspired to eject Shubh Pittsburgh from ownership for Hilton's benefit.  *Id.* ¶19.

11

In order to achieve this, Hilton engaged in the same pattern it employed in *JFK* and in this case.  Specifically, Hilton used the threat of termination and default to extract concessions from counterparties and avoid its obligations.  Hilton declared baseless defaults, arranged for Blackrock Financial to take and misuse control of Shubh Pittsburgh's operating funds, and made misrepresentations to Shubh Pittsburgh, all to restore Hilton to full ownership of the Pittsburgh hotel property.  *Id.* ¶¶ 20-23, 26-29, 41-43.

In short, Zinc is not alone in experiencing Hilton's unlawful methods designed to avoid a contract.[9]

## **ARGUMENT**

Under 28 U.S.C. §1782, a United States District Court is permitted to grant discovery for use in a foreign proceeding.  The statute provides, in pertinent part, that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . .  The order may be made . . . upon the application of any interested person. . . .

An application under §1782 must satisfy three statutory requirements:  "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012); *In re Request for Judicial*

---

[9]    Similarly, in *US Bank N.A. v. Hilton Worldwide, Inc.*, No. 2:11-cv-02823, ECF No. 1 (E.D. La. Nov. 14, 2011), Hilton executed and then reneged on a letter agreement offering a Hilton franchisee's lender the opportunity to cure any defaults of the franchise agreement. Hilton threatened to terminate the franchise agreement when it sought to replace the franchisee with a third-party manager.  *See* Scott Decl., Ex. D.

*Assistance from the Dist. Court in Svitavy, Czech Republic*, 748 F. Supp. 2d 522, 525 (E.D. Va. 2010).

Once an applicant satisfies the three statutory factors, the court must consider the four discretionary factors that the Supreme Court set forth in *Intel*:  (1) whether the respondent is a party to the foreign proceeding and therefore within the jurisdictional reach of the foreign tribunal, such that the foreign tribunal could itself order the testimony or production of documents; (2) the nature of the tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government to U.S. federal-court assistance; (3) whether the §1782 application conceals an attempt to circumvent foreign proof-gathering restrictions or other foreign or U.S. policies; and (4) whether the request is unduly burdensome or intrusive, in which case it may be rejected or trimmed.  *Intel*, 542 U.S. at 264-65.

No one factor is dispositive and district courts have broad discretion in determining whether to grant a §1782 application.  *See Marubeni Am. Corp. v. LBA Y.K.*, 335 Fed. Appx. 95 (2d Cir. 2009).  Moreover, the Supreme Court has acknowledged Congress's intent to interpret the statute broadly.  *Intel*, 542 U.S. at 247-48; *see also In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

## I.  ZINC'S APPLICATION MEETS ALL THE STATUTORY REQUIREMENTS FOR DISCOVERY PURSUANT TO 28 U.S.C. §1782

There can be no question that Zinc can meet all three of §1782's requirements.  As described below, Respondent can be found in this District, the discovery Zinc seeks is for use in a foreign proceeding before a tribunal, and Zinc is an interested person.

### A.  Respondent Can Be Found in This District

Hilton US "resides or can be found" in this District, having engaged in "systematic and continuous" business in New York.  A corporation can be found in any district where it has a "systematic and continuous" presence.  *See In re Republic of Kazakhstan for an Order Directing*

*Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) ("Clyde & Co. LLP's partners' daily practice of law in this jurisdiction gives it the requisite 'systematic and continuous' presence to be "found" here for purposes of section 1782."); *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this district).

Hilton has engaged in the sort of systematic and continuous activities that courts have considered sufficient to allow a corporation to be "found" in a district for purposes of §1782. First, Hilton is traded on the New York Stock Exchange, located at 11 Wall Street, New York, NY 10005, under ticker symbol "HLT."  Second, it uses New York law firms to prepare credit agreements with New York branches of international banks.  For example, in October 25, 2013 (amended March 16, 2017), Hilton entered into a credit agreement involving two of its subsidiaries, where Deutsche Bank AG, New York branch, acted as administrator for that agreement.  As part of the agreement, the New York law firm of Simpson Thatcher & Bartlett was required to provide a favorable opinion to the loan parties.  *See* Scott Decl., Ex. G, at 1, 3.

Third, a choice of law provision is a factor courts must consider in any determination of whether a party has availed itself of the benefits and protections of the state's laws for jurisdictional purposes.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) ("Nothing in our cases, however, suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes.") (emphasis in original).  In its 2017 Form 10-K in the context of a restricted stock unit agreement, Hilton stated that "[a]ny suit, action or proceeding with respect to this Agreement . . .  shall be brought in any court of competent jurisdiction in the

State of New York . . .  and each of the Participant, the Company, and any transferees who hold RSUs pursuant to a valid assignment, hereby submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding, or judgment." *Id.*, Ex. F at ¶15.

Finally, there are nine different Hilton branded locations in New York City. *See* Scott Decl., Ex. H.  In short, Hilton has a significant, continuous presence in New York and thus "resides or is found" in this district.

**B.**    **The Discovery Sought Is for Use in a Foreign Proceeding Before a Foreign Tribunal**

Zinc is engaged in litigation before the Business and Property Courts of England and Wales – exactly the kind of "conventional" court that qualifies as a "tribunal" for the purposes of §1782. *Intel*, 542 U.S. at 248-49 (describing Congress's expansion of §1782 to include tribunals other than conventional courts, which have always been included).  Further, the evidence sought in a §1782 application need only be ***relevant*** to the foreign proceedings, in accordance with Federal Rule of Civil Procedure 26(b)(1), in order to be for use in those proceedings as §1782 requires.  *See, e.g.*, *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1029 (N.D. Ill. 2006).  A district court considering the §1782 application need not determine that the evidence would be ***admissible*** in the foreign tribunal. *Id.*; *In re Veiga*, 746 F. Supp. 2d 8, 17-18 (D.D.C. 2010).  Nor does the district court have to find that the evidence would be ***discoverable*** in the foreign jurisdiction (that is, legally obtainable under that jurisdiction's discovery rules) before granting a §1782 application.  *Intel*, 542 U.S. at 259-63.

The standard of relevance for obtaining §1782 relief is, in fact, favorable to the applicant. "[T]he burden imposed upon an applicant is *de minimis.*"  *Veiga*, 746 F. Supp. 2d at 18 (granting relief based on *prima facie* showing of relevance to claims and defenses the applicant seeks to

assert in good faith); *see also In re Republic of Ecuador*, No. 1:10-mc-00040 GSA, 2010 WL 4027740, at *4 (E.D. Cal. Oct. 14, 2010) (granting application upon *prima facie* showing of relevance to foreign proceeding).   Most notably, in *In re Application Pursuant to 28 U.S.C. §1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L&M Galleries and Other Non-Participants for Use in Actions Pending in the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008), the Court granted a §1782 application where parties had a factual dispute over whether the information sought would be relevant – because it would be inappropriate to deny discovery based on irrelevance where such a dispute exists.

Here, Zinc plainly satisfies this requirement.   The information sought in the Subpoena is highly relevant to the foreign proceeding because it relates to Hilton's conduct in trying to avoid its obligations under the terms of the Hotel Leases, the very agreements at issue in the foreign proceeding.   Hilton would be the only entity to have insight into its corporate policy and internal communications with employees.   Hilton's structure, relationship to other Hilton entities, communications with Lenders, communications with real estate agents, communications with potential bidders for the Hotel Portfolio, communications with the Administrators, and assessments of Zinc's liabilities also bear direct relevance on the subject of the Lawsuit.

### C.      Zinc Is an Interested Person

Zinc is a party to the Lawsuit.   *See* Hollway Decl., Ex. B.   Given its status as a party, there can be no doubt that Zinc is an interested person pursuant to §1782.   *Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke §1782.") (modification in original).

In sum, Zinc meets all three statutory requirements for granting its application under §1782.

## II. THE DISCRETIONARY FACTORS SET FORTH IN *INTEL* WEIGH IN FAVOR OF GRANTING ZINC'S APPLICATION

Once an applicant meets the §1782 statutory requirements, the Court considers the four discretionary factors that the Supreme Court established in *Intel* in deciding whether to grant the application. As described below, Zinc meets these factors as well.

### A. The First *Intel* Factor Weighs in Favor of Granting Discovery

Under the first *Intel* factor, courts initially examine whether the applicant is seeking discovery from a party or a non-party to the foreign litigation. Where, as here, the respondent is a party, "the true question at hand is whether the requested discovery is available to the foreign tribunal without the assistance of this Court." *In re Request for Judicial Assistance from the Dist. Ct. in Svitavy, Czech Rep.*, 748 F. Supp. 2d 522, 526 (E.D. Va. 2010); *see also Gorsoan Ltd. v. Bullock*, 652 Fed. Appx. 7, 9 (2d Cir. 2016) ("[P]articipation in the foreign proceedings does not automatically foreclose §1782 aid.").

Courts frequently grant §1782 applications where, as is the case here, the requested discovery cannot be obtained in the foreign proceeding. For example, in *In re Application of Carsten Rehder Schiffsmakler Und Reederei Gmbh & Co.*, No. 6:08-mc-108, 2008 WL 4642378 (M.D. Fla. Oct. 17, 2008), the court granted a §1782 application against a party to a Chinese proceeding where it was established, through a declaration by the applicant's Chinese counsel, "that China's rules of procedure relating to discovery are not comparable to our own and that obtaining the information without this Court's assistance is by no means assured." *Id.*, at *2; *see also In re Clerici*, 481 F.3d 1324, 1334-35 (11th Cir. 2007) (holding that, although Clerici was a party (indeed, the plaintiff) in a Panamanian proceeding, §1782 assistance was justified because Clerici had left Panama and the Panamanian Court was unable to enforce its own order to produce information).

Here, the requested discovery is unavailable under English discovery rules.  Zinc seeks documents from, and to take the deposition of, Hilton.  In addition to basic inquiries into organizational structure and document retention, Zinc seeks testimony and documents relating to Hilton's corporate policy as it pertains to loss-making or underperforming hotels, including the handling of obligations under such leases and/or termination of them.  Zinc also seeks information regarding Hilton's valuation of the Hotel Portfolio, which would affect Hilton's actions under the lease and the sales process.  Finally, Hilton seeks information and testimony regarding the sales process, including its communications with prospective bidders, Agents, Lenders, and eventual Administrators.

None of this evidence would be available in England.  As a general matter, English law allows depositions only in very limited circumstances that do not apply here.  *See* Hollway Decl. ¶13.  As the Court of Appeal in England has stated, the primary purpose of taking a deposition in an English proceeding is to take evidence "from a witness ***whom it would be impossible to bring to court for trial***."  *Barrat v Shaw & Ashton* [2001] CP Rep 57 (emphasis added).  More significantly, there is no equivalent to the type of deposition – a Rule 30(b)(6) deposition – that Zinc seeks here.  Hollway Decl. ¶ 14.

The information and testimony gathered from this deposition and the requested documents will also serve to clarify and potentially narrow the issues that the foreign tribunal will have to decide.  "U.S. Style" discovery would achieve this objective.  However, because English discovery rules are not comparable to U.S. Style discovery, the English courts would not provide the type of evidence that Zinc seeks.  *See* Hollway Decl. ¶¶ 12-16.

**B.      The Second *Intel* Factor Weighs in Favor of Granting Discovery**

The second *Intel* factor concerns "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.  Receptivity here means whether the foreign court would ***reject*** evidence obtained through §1782, and not whether the foreign court would or could permit the discovery.  There is a strong presumption in favor of the foreign court's receptivity, and a party must present "authoritative proof" to overcome that presumption. *Euromepa S.A. v R. Esmerian, Inc.*, 51 F.3d 1095, 1099-101 (2d Cir. 1995).

Here, the foreign tribunal in question is an English court of law.  The English courts are receptive to §1782 assistance from U.S. federal courts and, in the absence of conduct contrary to law, will admit produced evidence.  *See e.g.*, *Teva Pharma B.V. v Amgen, Inc* [2013] EWHC 3711 (Pat) ("Furthermore, there are other potential ways for Teva to obtain disclosure from AI even if AI ceases to remain a party.  Even if no order could be made under CPR Rule 31.17 because AI is outside the jurisdiction (as to which I express no view), Teva could make an application in the USA under 28 USC §1782."); *Nokia Corp v InterDigital Technology Corp* [2004] EWHC 2920 (Pat) ("[T]he English court should not, subject to the caveat [regarding actions contrary to law], concern itself with the manner in which the material sought to be admitted is obtained.").  Indeed, in *Intel* itself, the Supreme Court cited the case of *South Carolina Insurance Co. v Assurantie Maatschappis "De Zeven Provincien" N.V.*, [1987] AC 24, in which the House of Lords ruled that non-discoverability under English law did not prevent litigants in an English court from seeking discovery in the United States pursuant to §1782. *Intel*, 542 U.S. at 262.  Other U.S. federal courts have granted §1782 relief on the understanding that English courts would not reject such assistance.  *See, e.g.*, *In re Application of Guy*, No. M

19-96, 2004 WL 1857580, at *2 (S.D.N.Y. Aug. 19, 2004).  Accordingly, the second *Intel* factor weighs in favor of granting the requested discovery.

### C.    The Third *Intel* Factor Weighs in Favor of Granting Discovery

The third *Intel* factor concerns whether the §1782 application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that §1782 requires that the evidence be discoverable in the foreign proceeding itself.  *Id.* at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions – reasons that do not necessarily signal objection to aid from United States federal courts.").

Here, Zinc circumvents no policies or restrictions.  On the contrary, Zinc acts in accordance with the House of Lords' statement described in section B, *supra*, which sets forth the English courts' policy towards §1782 discovery in aid of English litigation – a wholly positive policy.  This factor also favors granting the requested discovery.

### D.    The Fourth *Intel* Factor Weighs in Favor of Granting Discovery

The fourth *Intel* factor suggests that "unduly intrusive or burdensome requests may be rejected or trimmed."  *Intel*, 542 U.S. at 265.  The standard to determine whether a request is intrusive or burdensome is substantially similar to civil litigation governed by the Federal Rules of Civil Procedure.  *See In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998) ("The reference in §1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."); *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-mc-417

(LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) ("[A] district court evaluating a §1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure") (modification in original)).

Here, Zinc seeks nothing unduly intrusive.  Zinc's request for documents and testimony is narrowly tailored and directly relevant to questions in the foreign proceeding.

Courts do not hold depositions to be inherently burdensome or intrusive, and will readily grant §1782 requests for testimony to assist in English or other foreign litigation.  *See In re Edelman*, 295 F.3d at 173 (reversing district court and granting petitioner's §1782 application to depose the defendant in a French litigation); *Matter of Simetra Global Assets Ltd. and Richcroft Invs. Ltd.*, No. 16-cv-2389, 2016 WL 3018692 (D.N.J. May 25, 2016) (granting petitioner's §1782 application to depose a defendant in an English arbitration); *App. of Sarrio S.A. for Assistance Before Foreign Tribunals*, 173 F.R.D. 190 (S.D. Tex. 1995) (granting petitioner's §1782 application to take depositions and produce documents in aid of Spanish and English litigations).

## CONCLUSION

Respondent possesses information highly material to the resolution of the Lawsuit in which Zinc's rights are at stake.  For the reasons stated above, Zinc respectfully requests that the Court (a) grant the Application for a discovery order; (b) enter the accompanying Proposed Order; (c) authorize Zinc, pursuant to 28 U.S.C. §1782, to serve the Subpoena, attached to the Scott Decl. as Exhibit A; and (d) grant any and all other relief to Zinc as the Court deems just and proper.

Dated: April 26, 2018                       Respectfully submitted,

                                             SCOTT+SCOTT ATTORNEYS AT LAW LLP

                                              */s/ David R. Scott*

DAVID R. SCOTT
SYLVIA M. SOKOL
RANDY MOONAN
ANJALI BHAT
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
david.scott@scott-scott.com
ssokol@scott-scott.com
rmoonan@scott-scott.com
abhat@scott-scott.com